[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14476
Non-Argument Calendar

_____

D.C. Docket No. 8:12-cv-00465-MSS-MAP


FABIOLA TORRES-SKAIR,

                                                    Plaintiff-Appellant,

versus

MEDCO HEALTH SOLUTIONS, INC.,

                                                    Defendant,

MEDCO HEALTH SOLUTIONS OF HIDDEN RIVER, LC,

                                                    Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(December 4, 2014)

Before JORDAN, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Fabiola Torres-Skair appeals the district court's grant of summary judgment in favor of her former employer, Medco Health Solutions of Hidden River, LC ("Medco"), on her claims of pregnancy discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 2000e-3(a) and § 2000e(k) ("Title VII"), and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10. In the district court, Torres-Skair claimed that Medco took three adverse employment actions against her because of her pregnancy: giving her a negative performance evaluation, placing her on administrative leave, and then terminating her employment. Medco asserted that the decisions were based solely on Torres-Skair's violations of work policies. After careful review, we affirm.

## I.

### A.    *Factual Background*

Medco is a third-party manager of prescription benefits for health insurers that provides prescription drugs by mail and prescription claims-processing services for insured persons. Torres-Skair began working for Medco as a clinical-care pharmacist in February 2009 at Medco's center in Tampa, Florida, mostly working over the telephone.

Her primary job duties at Medco included counseling patients about medications and encouraging patients to sign up for mail-order prescription services provided by Medco, instead of buying their prescriptions at retail stores.

2

With the pharmacists' knowledge, Medco monitored their telephone calls. Torres-Skair's direct supervisor at Medco was Yvette Powrie. Powrie, in turn, reported to Jennifer Narducci, the director of the group in which Torres-Skair worked.

Torres-Skair began working from home in early 2010, using a computer, auto-dialer, and headset provided by Medco. While working at home, she had equipment trouble that persisted throughout her tenure.

Beginning in 2010, Medco for the first time instituted production quotas. Pharmacists in Torres-Skair's group initially were expected to meet certain weekly goals for the number of prescriptions they converted from retail to mail order ("prescriptions per week") and the rate at which they converted those prescriptions ("accept rate"). At some point in mid-2010, Medco added more goals relating to the number of calls pharmacists made ("green lights") and the percentage of time they spent logged on but not actively on a call ("idle time").

### 1.    Medco Learns that Torres-Skair is Pregnant

Torres-Skair found out that she was pregnant sometime in October 2010. Before this time, management had had some concern about Torres-Skair's production. Without knowledge of Torres-Skair's pregnancy, Powrie called Torres-Skair on October 29, 2010, and explained that her job performance was deficient, specifically with respect to her prescription numbers, and she identified several areas for improvement. After this discussion, but during the same

3

telephone call, Torres-Skair told Powrie for the first time that she was pregnant. Powrie passed this information to Narducci two days later.

Beginning on January 1, 2011, Medco increased the prescriptions-per-week goal for all pharmacists in Torres-Skair's group. Then, Narducci directed Powrie to develop plans to help certain employees, including Torres-Skair, achieve the new production requirements.

At about the same time, Torres-Skair informed Medco that she had been placed on certain medical restrictions by her physician. Powrie thereafter began to make comments to Torres-Skair regarding her pregnancy and related medical restrictions. Powrie stated that Torres-Skair was "moody," "that [her] pregnancy was affecting [her] effectiveness," "that the doctor's notes that [she] was giving were reducing [her] production" because they meant that Torres-Skair would not be able to be on the telephone as much as usual, and that she thought that Torres-Skair was "more moody than usual." Powrie also told Greg Chavez, Powrie's counterpart in Arizona, that Torres-Skair was pregnant.

2.    The 2010 Annual Performance Evaluation

Torres-Skair received her 2010 performance evaluation from Powrie on March 9, 2011. According to Powrie's evaluation, Torres-Skair was "consistently below the goals" for prescriptions per week, green lights, and idle time, and her performance had declined during the year. Powrie further stated that Torres-

4

Skair's "performance d[id] not meet expectations," that it "require[d] improvement," and that "[s]he display[ed] a negative demeanor about the position" that came through occasionally on her calls. Due to the evaluation, Torres-Skair did not receive a bonus or stock opportunities with Medco.

Over the next several days, Torres-Skair filed anonymous complaints with Medco's Ethics Hotline's toll-free number about Powrie and Chavez, claiming that they had retaliated against her for expressing concerns about the job.[1] She also complained that Powrie told Chavez that Plaintiff was pregnant and hormonal. Medco investigated the complaint and did not find any retaliation.

    3.    Torres-Skair is Placed on Administrative Leave and then Discharged

Acting on a request from another Medco manager, who interacted with Torres-Skair's group, Medco began investigating Torres-Skair's sales calls in May 2011 to determine if she was "refaxing" prescription requests. Refaxing occurred when a pharmacist faxed a request for a customer's prescription to the customer's physician after that same request had already been faxed, which resulted in a pharmacist receiving additional credit for the same prescription. According to Torres-Skair, this was common practice and condoned by Powrie, among others.

Another Medco manager, Brian Schumm—who also did not supervise Torres-Skair—conducted the research and reviewed Torres-Skair's sales calls for a

---

[1] Torres-Skair had expressed negative sentiments about the job to Chavez during a focus-group meeting in February 2011.

one-week period in May 2011.   From his research, Schumm observed the following relevant issues in Torres-Skair's calls:  (1) Torres-Skair disconnected a call with a customer; (2) she refaxed prescription requests instead of obtaining verbal orders from physicians; (3) she remained on the line for an excessive period of time without leaving a voicemail; and (4) she did not appear to be answering many of the calls that were being routed to her.

On May 18, 2011, Torres-Skair notified Powrie that she was contacting Medco's third-party handler of claims under the Family and Medical Leave Act ("FMLA"), in anticipation of taking FMLA maternity leave.

Two days later, on May 20, 2011, Powrie, Narducci (Powrie's supervisor), and Jennifer Bannon (a human resources manager), conducted a conference call with Torres-Skair regarding Schumm's report of her sales calls.  During the call, Torres-Skair was placed on administrative leave pending further investigation. Afterwards, Torres-Skair called the Ethics Hotline and stated her belief that Narducci, Bannon, and Powrie were "building a case" to provide management reason to terminate her in order to deprive her of maternity-leave benefits.  After the conference call, Powrie learned that Torres-Skair had intended to start her FMLA leave that same day.

After conducting additional research based on Schumm's report, Narducci ultimately obtained approval to terminate Torres-Skair's employment for hanging

6

up on a customer, avoiding calls, and failing to follow standard operating procedure with respect to refaxing. Narducci specifically found that Torres-Skair had violated "Work Rule 11," which listed "[h]anging up on a customer—or otherwise inappropriately terminating a call" as a serious infraction which could lead to termination without prior warning or other disciplinary action. On May 31, 2011, Bannon notified Torres-Skair in writing that her employment with Medco was being terminated for "issues concerning [her] performance including but not limited to the disconnecting of a member on May 7, 2011."

B.    *Procedural History*

Torres-Skair filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in July 2011. She received her notice of right to sue in December 2011, and timely filed the instant action in the United States District Court for the Middle District of Florida. The district court granted summary judgment to Medco, concluding that Torres-Skair had failed to establish a prima facie claim of pregnancy discrimination. The court further concluded that, even if Torres-Skair had established a prima facie claim with respect to the administrative leave and termination decisions, she had not shown that Medco's reasons for the adverse actions were pretextual. Finally, the court concluded that Torres-Skair had not shown that she was retaliated against for statutorily protected conduct. This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*, viewing all evidence in the light most favorable to the non-movant. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). A movant is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

## III.

On appeal, Torres-Skair argues that (1) she established a prima facie case of pregnancy discrimination by showing that she was treated differently than valid comparators and that Medco violated its own policy in terminating her; (2) she satisfied her burden of establishing pretext; and (3) she presented sufficient circumstantial evidence of retaliation to defeat summary judgment. We address each argument in turn.

### A.    *Pregnancy Discrimination*

Title VII and the FCRA prohibit certain employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.

8

§ 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a).  The term "because of sex" includes "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).  *See also Delva v. Continental Grp., Inc.*, 137 So. 3d 371, 375-76 (Fla. 2014) (holding that the FCRA prohibits pregnancy discrimination).

"Under Title VII, a plaintiff may prevail on a claim by showing that her pregnancy 'was a motivating factor' for an employment decision."  *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-2(m)).  To prove the claim, a plaintiff may rely on direct or circumstantial evidence.  *Id.* Direct evidence is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption.  *Id.*  Circumstantial evidence, by contrast, requires an inferential leap to establish discriminatory motive.

"[O]nly the most blatant remarks whose intent could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  *Id.* (quotation marks omitted).  No evidence presented by Torres-Skair meets this rigorous standard.  She has pointed to comments made by Powrie, such as that Torres-Skair was "moody," "hormonal," and that her pregnancy and medical restrictions were affecting her production, which certainly are probative of Powrie's state of mind.  But a factfinder still must infer that whatever discriminatory animus these comments evidence actually motivated Powrie's

9

negative performance review of Torres-Skair, her placement on administrative leave, or her termination—a fact that precludes the comments from constituting direct evidence of discrimination.[2] *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999). In this respect, Torres-Skair's reliance on *Holland* is misplaced. In *Holland*, this Court found direct evidence of discrimination where the decision maker explicitly testified that part of his reasoning for transferring the plaintiff was her pregnancy. 677 F.3d at 1058. Clearly, if believed, the testimony in *Holland* proved that the plaintiff's pregnancy was a motivating factor for the transfer decision. No similar comment is part of the record before us.

Because no direct evidence of discrimination on the basis of pregnancy exists on this record, we apply the burden-shifting framework of *McDonnell Douglas* for claims based on circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973); *Holland*, 677 F.3d at 1055. The plaintiff bears the initial burden of presenting a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817.

---

[2] Nor does the record reflect that Powrie exercised any real influence on the decision to place Torres-Skair on administrative leave or to terminate her employment. Although Powrie was involved during this process, unrefuted testimony shows that Narducci placed Torres-Skair on administrative leave and made the recommendation to terminate her employment based on a report prepared at the request of another supervisor who did not supervisor Powrie or Torres-Skair. Powrie's effect on these decisions is too indirect and remote to be actionable. *See, e.g., Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (stating that a party with no power to discharge may be liable for discrimination where the party is "actual cause" of the decision to terminate the employee).

To establish a prima facie case of pregnancy discrimination, a plaintiff may show that she was (1) pregnant; (2) qualified to do the job; (3) subjected to an adverse employment action; and (4) treated differently than similarly situated non-pregnant employees, in that employment or disciplinary policies were differently applied to her. *See DuChateau v. Camp, Dresser & McKee, Inc.*, 713 F.3d 1298, 1302 (11th Cir. 2013); *Holland*, 677 F.3d at 1055. In determining whether employees are similarly situated, we have explained that a "comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004). Nevertheless, "[a] plaintiff alleging pregnancy discrimination need not identify specific non-pregnant individuals treated differently from her, if the employer violated its own policy in terminating her." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000). If a prima facie case is established, the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the employment decision. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*).

Once the defendant articulates such a legitimate, non-discriminatory reason, the plaintiff then must show that the defendant's reason was pretextual. *Id.* To establish pretext, a plaintiff must create a genuine issue of material fact that the reasons given by the employer were not the real reasons for the adverse

11

employment decision, but were pretexts for discrimination.  *Id.* at 1024-24.

Alternatively, the plaintiff may survive summary judgment by presenting sufficient

circumstantial evidence to raise a reasonable inference of intentional

discrimination.  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320

(11th Cir. 2012).

The district court here found that Torres-Skair had satisfied the first three

requirements of her prima facie case but that she had failed to show a valid

comparator for purposes of assessing whether she was treated differently.  We now

turn to the three adverse employment actions asserted by Torres-Skair: the negative

performance evaluation in 2010, her placement on administrative leave, and her

eventual termination.  The district court and the parties addressed the latter two

actions together, and we will do so as well.

    1.    <u>Negative Performance Evaluation</u>

Torres-Skair contends that four other non-pregnant pharmacists received

more favorable evaluations in 2010 despite having similar production numbers.

She relies on a ranking sheet of pharmacists for average prescriptions per week

over the year, which shows that one other pharmacist, Katrina Stokes, actually

performed worse on this criterion (36 per week) than Torres-Skair (39 per week).

The chart states, "Needs improvement = less than 38rxs/week."  Torres-Skair was

the only pharmacist who received the "NI" rank for "needs improvement."

Here, Torres-Skair did not present sufficient evidence that would allow a reasonable jury to find that her pregnancy was a motivating factor in Powrie's negative evaluation.  First, the single statistic on which Torres-Skair seeks to compare herself to Stokes (and the other pharmacists) does not take into account the other criteria on which the pharmacists were evaluated, such as green lights, idle time, and other similar factors.  The ranking sheet that Torres-Skair relies on covers only the prescription numbers and was not otherwise analyzed through testimony.  *See, e.g.*, *Wilson*, 376 F.3d at 1089 ("Statistics without any analytical foundation are virtually meaningless.") (citation and quotation marks omitted).  As a result, the court cannot ascertain whether Stokes was similarly situated to Torres-Skair for purposes of her 2010 performance evaluation.  Nor does the evidence allow for a meaningful comparison to the other non-pregnant pharmacists.  Therefore, the district court properly found that Torres-Skair failed to show that similarly situated employees outside of her protected class were treated differently.  *See id.* at 1091.

Furthermore, Torres-Skair's supervisors initially identified Torres-Skair's deficient job performance well before learning that she was pregnant.  Significantly, on April 15, 2010, Narducci sent an email to Powrie expressing concern about Torres-Skair's low prescription numbers.  On September 29, 2010, Powrie sent an email to Torres-Skair asking her to explain why her statistics were

low the previous Friday.  Then, on October 29, 2010, Powrie called Torres-Skair and, after discussing her job performance, explained to her that if Torres-Skair did not improve her performance, she might have to return to work at the call center instead of working from home, or she might be placed on a performance-improvement plan.  Following this discussion and fifty minutes into the telephone call, Torres-Skair advised Powrie for the first time that she was pregnant.  Powrie informed Narducci of Torres-Skair's pregnancy on November 1, 2010.

In addition, a review of Torres-Skair's quarterly prescription production corroborates Torres-Skair's supervisors' impressions that Torres-Skair's work had, in fact, decreased.  In the first quarter of 2010, Torres-Skair had 572 quarterly prescriptions; she had 519 in the second, 486 in the third, and 459 in the last—a decrease of 5% each quarter for a total decrease of 20% from the first quarter to the last, and Torres-Skair did not inform Defendant of her pregnancy until well into the last quarter of the year.

While we are troubled by the comments that Torres-Skair attributes to Powrie and acknowledge that the evidence shows that Powrie thought Torres-Skair's job performance had been negatively affected by her pregnancy after learning of it, those facts alone do not create a material dispute of fact that Powrie's negative evaluation was motivated by unlawful discrimination.  "Under the PDA, the employer must ignore an employee's pregnancy and treat her as well

14

as it would have if she were not pregnant." *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1313-14 (11th Cir. 1999) (internal quotation marks omitted).  In other words, deficient job performance remains a non-discriminatory basis on which employers may make employment decisions, so long as performance standards are applied equally.[3]

For these reasons, the district court properly concluded that Torres-Skair did not establish a prima facie claim based on the negative performance evaluation.

2.    Administrative Leave and Discharge

Regarding valid comparators for her claims based on administrative leave and termination, Torres-Skair points out that Abigail Capito, who had similar average prescription numbers (40 per week) as Torres-Skair, was put on a "performance focus plan" ("PFP"), while Torres-Skair was not.  Torres-Skair also contends that she need not show a comparator because Medco violated its own policies by firing her without first giving her a PFP.

The record shows that Medco's policies provide for a progressive disciplinary system to address deficient job performance.  First, pharmacists receive coaching.  If no improvement is shown, Medco will institute a PFP for the pharmacist.  After a pharmacist fails to meet the components of a PFP, Medco will

---

[3]    Nonetheless, unlawful discrimination may be shown where an employer fails to accommodate pregnant employees in the same way that employees with temporary disabilities are accommodated, *see Spivey*, 196 F.3d at 1312-13, or disallows pregnant employees to take sick leave for pregnancy-related conditions where such relief is available to other non-pregnant employees, *see Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1382-83 (11th Cir. 1994).

implement a final written PFP, which may result in further disciplinary action or, eventually, termination. In this case, Torres-Skair's supervisors agreed in February 2011 that a PFP was necessary to address her performance issues. Powrie in fact drafted such a plan and submitted it to Narducci for her review. However, Medco never implemented the PFP for Torres-Skair.

Nevertheless, we disagree that Medco's failure to implement a PFP for Torres-Skair before she was terminated shows that the company treated her differently than a similarly situated pharmacist or violated its own policies. Notably, Torres-Skair has not shown that the only way in which an employee may be fired is after being placed on a PFP or related plans. Medco's stated reason for Torres-Skair's discharge was a violation of Work Rule 11, among other issues not directly related to deficient production. Work Rule 11 specifically provides that hanging up on a customer or otherwise inappropriately terminating a call is a "serious infraction which could lead to discharge without prior warning or other disciplinary action." The director of pharmacy practice at Medco testified that this rule was "zero tolerance." Torres-Skair has not pointed to any evidence in the record where Medco used a PFP to address a violation of a Work Rule.

In view of the foregoing, the fact that Torres-Skair was not placed on a PFP does not indicate either (1) that she was treated differently than Capito, because there is no evidence that Medco believed that Capito also had hung up on a

16

customer; or (2) that Medco violated its own policies.  Consequently, the district court did not err in finding that Torres-Skair had failed to establish a prima facie claim based on her placement on administrative leave and subsequent termination.

In any case, even assuming that Torres-Skair established a prima facie case of pregnancy discrimination, she failed to show that the legitimate, non-discriminatory reasons proffered by Medco were pretextual.  Medco offers three such reasons: (1) Torres-Skair hung up on a customer; (2) she refaxed prescription requests; and (3) she avoided calls.  Medco claims that these reasons are not independent because each contributed in some way to the decision to terminate Torres-Skair.

We might be more inclined to disturb the district court's ruling if Medco relied on refaxing alone.  Torres-Skair presented evidence that other pharmacists engaged in refaxing, that Powrie told pharmacists how to refax, and that refaxing generally, at least under certain circumstances, was an accepted practice that would generate an additional prescription credit.

As it stands, however, Medco provided multiple, intertwined, non-discriminatory reasons for its administrative leave and termination decisions. Torres-Skair has not rebutted Medco's other reasons, particularly Medco's belief that she inappropriately terminated a call with a customer.  Torres-Skair argues that Medco's invocation of Work Rule 11 was pretextual because Medco also had in

17

place a Workplace Harassment Policy, which prohibited employees or customers from engaging in "name calling, slurs, or derogatory remarks," and "verbal abuse or ridicule based on some personal group characteristic."  If Work Rule 11 required her to stay on the phone while the customer referred to her as a "dot head," she asserts, then it violated the harassment policy.

Although Torres-Skair attempts to frame the harassment policy and Work Rule 11 as directly in conflict, she has not presented any evidence supporting that contention.  Unrebutted testimony established that hanging up on a patient was never appropriate, and Medco policy listed hanging up on a patient as a ground for termination, potentially without prior warning.  Nowhere in the harassment policy does it authorize an employee to terminate a call when she believes she is the subject of harassment.  Rather, the policy provides that an employee who believes she has been the victim of harassment should report the incident to her supervisor or someone in management, which will trigger an investigation.  Nor has Torres-Skair presented a similar instance in which Medco retained a non-pregnant employee who terminated a call because of a derogatory remark.

Torres-Skair's own conviction that she did not inappropriately hang up on the customer in violation of Medco rules is insufficient to show pretext.  She has presented no evidence that Medco did not honestly and in good faith believe that she violated a rule.  *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997)

("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance.").

Finally, Torres-Skair contends that the temporal proximity of her request for FMLA leave and the administrative leave and termination decisions shows that Medco's reasons were pretextual. However, the report that served as the basis for her termination was requested by a manager who was not Torres-Skair's supervisor and prepared by Schumm, another manager who also was not Torres-Skair's supervisor, and there is no evidence indicating that either had knowledge of Torres-Skair's request for FMLA leave or even her pregnancy when those actions were taken.[4] Yet the only evidence in the record indicates that the conference call and subsequent termination were predicated upon the findings of the report written by Schumm. Nor is there evidence that Narducci or Bannon, the relevant decision makers, had knowledge of Torres-Skair's request for FMLA leave before the conference call during which Torres-Skair was placed on administrative leave.

For these reasons, Torres-Skair has not presented sufficient circumstantial evidence by which a jury could reasonably infer that Medco's non-discriminatory reasons were pretextual or that Medco otherwise was motivated to discriminate against her on the basis of her pregnancy.

---

[4] To the extent that Torres-Skair argues that Medco violated the FMLA, she did not raise such a claim before the district court and we decline to consider her arguments with respect to any purported violations of the FMLA on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (holding that issues not raised in the district court and raised for the first time on appeal will not be considered).

19

B.    *Retaliation*

Torres-Skair also argues that she sufficiently established a retaliation claim. Torres-Skair's apparent theory of retaliation in this case is as follows:   (a) she complained about Powrie's pregnancy comments; (b) because of the complaint, Powrie received "coaching" from management on "addressing employee concerns, sharing employee information, and sensitivity around health related topics"; (c) in retaliation, Powrie failed to intercede on Torres-Skair's behalf during the May 20 conference call by corroborating that Torres-Skair was having computer issues; and (d) as a result, Torres-Skair was placed on administrative leave and subsequently terminated.

Title VII prohibits employers from retaliating against an employee because she has opposed acts made unlawful by that law.  42 U.S.C. § 2000e-3(a).  In order to establish a prima facie case of retaliation, the plaintiff may show that (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse action; and (3) a causal link existed between the events.  *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010).  While this action was pending in the district court, the Supreme Court clarified the standard for causation in retaliation cases: the plaintiff must show that the adverse action would not have occurred but-for the protected activity.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517 (2013).

The district court correctly concluded that Torres-Skair failed to establish a prima facie case of retaliation through circumstantial evidence. Even assuming that Torres-Skair engaged in statutorily protected conduct, she has not presented sufficient evidence from which a reasonable jury could find a causal connection between her complaints and the adverse actions. For the reasons we have elaborated above, it is nothing more than mere speculation to suggest that, if Powrie had spoken up, Torres-Skair would not have been placed on administrative leave or discharged. Any purported causal connection between the protected conduct and the adverse actions is far too indirect and attenuated to be actionable. Similarly, Torres-Skair has not shown that her complaint after she was placed on administrative leave was the cause of her termination. Consequently, based on the totality of the evidence before us, the district court did not err in finding that Torres-Skair failed to state a prima facie claim of retaliation.

## IV.

In short, we affirm the district court's grant of summary judgment in favor of Medco on all counts of the complaint.

**AFFIRMED.**

21